# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-2683

CHRISTOPHER S. HALL,

*Plaintiff-Appellant*,

v.

ALLEN BENNETT and STAN RUSSELL,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. IP 99-1125-CM/S—**Larry J. McKinney**, *Chief Judge.*

———————

ARGUED MAY 19, 2004—DECIDED AUGUST 12, 2004

———————

Before CUDAHY, RIPPLE, and WILLIAMS, *Circuit Judges*.

CUDAHY, *Circuit Judge*. After receiving a severe electrical shock while working as an electrician at the Correctional Industrial Facility in Pendleton, Indiana, inmate Christopher Hall sought to hold supervisors Stan Russell and Allen Bennett liable under 42 U.S.C. § 1983 and state law. Concluding that Hall lacked evidence that the defendants had knowingly placed him in a dangerous situation, the district court granted summary judgment on the federal deliberate-indifference claim and then relinquished sup-

plemental jurisdiction over the state-law negligence claim. We vacate the district court's judgment and remand for further proceedings.

From June to August 1997, Hall worked in the Food Industry Plant, where Russell was the plant engineer. Hall performed regular maintenance duties, primarily as an electrician. Hall and another inmate worked under the supervision of Bennett, the electrician foreman. On July 29, 1997, Russell directed Bennett's team to locate an electrical circuit in the plant capable of handling the additional load of another machine. What happened next is disputed.

According to Hall, he was assigned to do electrical work even though he was not a journeyman electrician. Before commencement of the July 29 task, Hall alleges that the team first asked Russell to let them perform the work after hours with the power off, but Russell refused, citing his desire to reduce overtime costs. To begin the assignment, the team obtained a circuit tracer, a voltage meter, and lineman's pliers with protective insulation on the handles. Hall insists that he also asked Bennett for protective gloves but was refused. Hall and Bennett then climbed above the ceiling of the plant and began testing the electric lines. Hall says that his first task with respect to each potential circuit was to attach the circuit tracer by stripping the insulation from the line and attaching alligator clips to the exposed wire. While he did this, Hall insists, Bennett stayed by his side instead of climbing down to shut off the power. Hall was using lineman's pliers to strip the insulation from a live 480-volt line in order to attach the tracer's alligator clips when current from the line entered his left middle finger and exited his left knee. Hall was knocked unconscious. He later surmised that the current had traveled into his hand because of a slit in the protective insulation covering the grips on the pliers, but he was never able to examine the pliers to confirm his suspicion. Bennett, says Hall, came to his cell afterward and apologized, taking responsibility for

the incident. And, Hall notes, the day after his injury Russell ordered new insulation for the pliers as well as electrician's gloves.

Russell and Bennett deny much of Hall's account. According to Bennett, he first asked Russell to authorize after-hours work only to prevent an accidental power outage elsewhere in the plant, and not because of safety issues concerning the team. Additionally, Bennett claims that when the team gathered the necessary equipment, Hall declined his offer of leather gloves. And, Bennett contends, Hall was not shocked until after he had tested numerous lines. Bennett maintains that, once they identified a circuit for testing, he went to the Mechanical Room to locate the circuit breaker that would shut off electricity to that line. As Bennett turned off the breakers one at a time, Hall was to use a voltage meter to determine whether the line was dead. That procedure, says Bennett, was being followed when Hall was injured. Hall called out that the correct circuit breaker had been located, and so Bennett returned to the room where Hall was. At that point Hall began stripping the insulation from the wire with the lineman's pliers and suffered the shock. Upon later inspection Bennett noticed that the pliers had a thin slit in the protective insulation on the grips. Russell, however, could not determine whether or not a crack existed in the pliers. Both Russell and Bennett attest that Hall declared himself at fault for his injury because he failed to verify that the line was dead before stripping away the insulation. But of course on summary judgment we resolve these factual disputes and inferences in favor of Hall, as the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

In granting summary judgment, the district court concluded that at most Hall could establish that the defendants had acted negligently rather than with deliberate indifference. The district court reasoned that Hall lacked evidence that the defendants knew that requiring him to work

without gloves would create a substantial risk to his safety. Because the court inferred that the defective pliers must have caused the injury, the court determined that, to succeed on his deliberate-indifference claim, Hall would have to prove that the defendants knew that the pliers had defective insulation on the grips and that allowing Hall to use the pliers without gloves would subject him to substantial risk of harm. Finally, taking note of the circuit tracer, the voltage meter and the pliers, the court reasoned that the defendants had provided Hall with other "safety equipment," thus negating the inference of deliberate indifference arising from the failure to supply protective gloves. The court then declined to exercise supplemental jurisdiction over the negligence claim.

To prevail on a deliberate-indifference claim under the Eighth Amendment, a plaintiff must produce evidence that satisfies two elements. First, the danger to the inmate must be objectively serious. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000). For the subjective prong, the defendants must have acted with deliberate indifference. *Farmer*, 511 U.S. at 838. Regardless whether the defendants intended harm, they need only have known of a substantial risk to inmate safety that they easily could have prevented but did not. *Id.* at 838; *Case v. Ahitow*, 301 F.3d 605, 605 (7th Cir. 2002). In this case the defendants do not dispute that working on a live electrical line without adequate protective equipment presents an objectively serious risk to inmate safety; rather, the defendants focus their defense on the subjective prong.

Hall, though, contends that a jury may infer from the record that the defendants knew, given the obviousness of the risk, that he could be electrocuted as a consequence of working on a live circuit of elevated voltage without protective gloves. A risk can be so obvious that a jury may reasonably infer actual knowledge on the part of the defendants sufficient to satisfy the subjective component of the deliberate-

indifference standard. *Farmer*, 511 U.S. at 842; *Proffitt v. Ridgway*, 279 F.3d 503, 506 (7th Cir. 2002); *Bagola v. Kindt*, 131 F.3d 632, 646 (7th Cir. 1997).

It is the defendants' failure to address this inference of actual knowledge that undermines their argument. Rather than responding to Hall's contention that the risk was obvious, the defendants continue to dispute Hall's version of events in complete disregard for the standards governing summary judgment, which require that all facts and inferences be viewed in favor of the nonmoving party. *See Payne*, 337 F.3d at 770. And therein lies our central concern: when we view all facts and inferences in favor of Hall, we cannot conclude that there exists no disputed issue of material fact with respect to the defendants' knowledge of the risk facing Hall.

Once we accept Hall's version of events as true for the purposes of summary judgment, there is sufficient evidence to establish that the defendants knew of the risk facing Hall. Hall was refused protective gloves to protect himself from being shocked while he worked. He was given the task of attaching a circuit tracer to a 480-volt line by stripping the wire bare, and Bennett, instead of turning the power off so that Hall could safely complete that task, stood beside Hall and watched as he stripped the live wire. Hall denies representing himself to Russell as a journeyman electrician, so we must assume that the defendants had no reason to believe that Hall was adequately trained or fully qualified as an electrician. Moreover, while the defendants offered no evidence that even a qualified electrician would have completed the task assigned to Hall without first donning protective gloves, Hall submitted uncontroverted evidence that a plant safety rule explicitly requires those performing electrical work to first turn off the power. And Bennett, as the electrician foreman, would have been aware of general safety codes that compel those working on even low-voltage circuits to wear insulated gloves when scrapping insulation on

a conductor known to be live. *See* NATIONAL ELECTRICAL SAFETY CODE, 2002 ED.§ 443, at 238 (2001); D.C. WINBURN, PRACTICAL ELECTRICAL SAFETY 103 (Occupational Safety and Health Series No. 15, 1988) (summarizing relevant sections of National Electrical Safety Code); JOHN CADICK, ELECTRICAL SAFETY HANDBOOK 3.34-35 (1994) (listing rubber gloves with leather protectors as among minimum safety equipment recommended for making low-voltage safety measurements). A jury could reasonably infer that the defendants, because of their respective positions as plant engineer and foreman electrician, were aware of the obviousness of the risk and knew of the necessity of wearing protective gloves when working on live wires carrying elevated voltages. *See Farmer*, 511 U.S. at 842 (jury may infer knowledge from circumstantial evidence alone); *Delaney v. DeTella*, 256 F.3d 679, 685 (7th Cir. 2001) (jury may infer from surrounding circumstances that defendants had been exposed to information regarding the risk); *see also Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998) ("[W]hat might not be obvious to a lay person might be obvious to a professional acting within her area of expertise."). And the defendants never made assertions to the contrary; indeed, they never denied knowing that working on a live 480-volt line without adequate protection against shock is inherently dangerous. *See Fruit v. Norris*, 905 F.2d 1147, 1150-51 (8th Cir. 1990) (explaining that "common sense" is relevant in deciding obviousness of risk). Furthermore, the defendants' argument that a jury could infer that Hall was solely at fault for failing to shut off the power before working on the wire fails upon consideration of a plant rule requiring inmates to do the tasks that their supervisors assign, which instead suggests that Hall had no ability to exercise this option without the defendants' permission.

In addition, the district court's conclusion that the other "safety equipment"—the voltage meter, the circuit tracer, and the pliers—provided by the defendants negated delib-

erate indifference overlooks the disputed chronology. Regardless whether Hall was provided with other safety equipment, in Hall's version of events, his first assigned task required protective gloves. Hall was directed to strip a live wire of insulation, so that he could *subsequently* attach the circuit tracer with alligator clips (and the defendants do not dispute that the circuit tracer had to be attached to the wire with alligator clips). Neither the voltage meter nor the circuit tracer would be of any use for this initial task. And regardless whether the slit in the pliers caused the injury and whether the defendants knew about the slit, the provision of insulated pliers does not save the defendants; a jury could infer from the electrical safety code mandating the use of protective gloves when cutting into the insulation on live wires that the defendants knew pliers alone would not protect Hall from the risk of electrocution. *See Wallis v. Baldwin*, 70 F.3d 1074, 1075-77 (9th Cir. 1995) (finding deliberate indifference where inmates were assigned to clean attic known to contain asbestos with only face mask for dust that explicitly warned of its inadequacy for use with asbestos); *Fruit*, 905 F.2d at 1150-51 (obvious risk of serious harm where inmates were exposed to raw sewage without adequate protective gear inside a well with temperatures reaching 125 degrees).

In sum, we conclude it was error to grant summary judgment for the defendants on this record. Accordingly, we VACATE the district court's grant of summary judgment and REMAND for further proceedings. In view of our resolution of the deliberate-indifference claim, our remand necessarily encompasses Hall's state-law negligence claim as well.

No. 02-2683

A true Copy:

  Teste:

                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*