NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1302n.06

Case No. 11-1912
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Dec 19, 2012*
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| KATHY PHANEUF, | ) |
| | ) |
| Plaintiff-Appellant, | ) |
| | ) ON APPEAL FROM THE |
| v. | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE EASTERN |
| MARK A. COLLINS, | ) DISTRICT OF MICHIGAN |
| | ) |
| Defendant-Appellee. | ) |
| | ) |
| _____ | ) |

BEFORE: BATCHELDER, Chief Judge; KEITH, and MARTIN, Circuit Judges.

ALICE M. BATCHELDER, Chief Judge. Plaintiff-Appellant Kathy Phaneuf is a Michigan prisoner who was traumatically injured in an industrial machinery accident. Defendant-Appellee Mark Collins, her state-employee supervisor, was operating the machine that caused her injury. Two years after the accident, Phaneuf sued Collins under 42 U.S.C. § 1983 for violating her Eighth Amendment right against cruel and unusual punishment. She also sued under state law. The district court, in an oral disposition, granted summary judgment against her claims. She timely appealed. We AFFIRM the district court's ruling.

I

A

On the morning of March 26, 2008, Phaneuf came into work at her prison job—operating a soap press machine—at Michigan State Industries just like she had been doing for over a year. Phaneuf was a hard-working, efficient, focused, punctual, and respectful employee—indeed, she had

been employee of the month once and Collins had repeatedly said that he "wish[ed he] had more people like Phaneuf." The soap press Phaneuf operated, like the other three presses operated by her co-workers, used two dies (that is, metal plates) to squeeze a rough block of soap into a nicely shaped bar of soap, complete with the initials of the workplace stamped on the top: "MSI." The press stamped out one bar of soap at a time, and the daily quota for each soap press machine was 22 boxes of soap with 270 bars of soap per box, for a grand total of almost 6,000 bars of soap per day.

On this particular day, it was necessary to perform a regular-but-infrequent transition called the "changeover," in which the dies on the press were changed to go from making small bars of soap to larger bars of soap (or vice versa). After the new dies were put in place, they had to be aligned, a process that required two steps. First, the dies had to be moved from side to side until they lined up vertically; this step was accomplished while the aligner was standing. Second, the bottom die had to be raised or lowered to squeeze the soap to the right thickness; this step was done with the aligner on his knees immediately in front of the machine. When the upper die was properly aligned, it slid down snugly and silently within the lower die. While the upper die was fairly easy to change, so much so that inmates were occasionally permitted to help change them, the lower die was always changed by a supervisor.

Collins was the changer on March 26, as had normally been the case for the previous eight years. Phaneuf's soap press was the first or second one that he worked on that day. The press sat on a large table which had a small recessed area—just big enough for one person—in which an individual stood to operate the press. Collins was in the recessed area while doing the changeover. As usual, he cycled the press—that is, he pushed the activation buttons to make it do a dry run, sans

soap—repeatedly to see if the dies were lined up. This was the "best, most efficient way" to check the press's alignment.

Phaneuf, who was returning to the press from a bathroom break, observed Collins cycle the press about five times before she arrived. Standing just behind his back, with her right shoulder inches away from his left shoulder, she heard Collins say, "It's good to go," and then saw him stand there with his hands on the activation buttons. Phaneuf took this statement to mean that the machine was aligned and ready for operation. Her nearby workstation teammate, Barbara Everett, responded, in a comment directed to Phaneuf but loud enough for Collins to hear, that she thought the bottom plate needed to come up higher. Phaneuf replied, "Do you think so?" and Everett said, "Yes." Phaneuf testified, "So that's when I reached around [Collins]" and toward the press to feel if the dies were aligned.

An important point needs to be stressed here: it is undisputed that the soap press is emphatically a one-person machine. Though the training the press operators received from MSI on press operation was somewhat wanting—apparently consisting of being plopped down with a four-inch-thick safety binder, receiving an in-person soap-press tutorial, and getting some annual training of an unspecified sort—Phaneuf and the other inmates were crystal clear on this rule. Indeed, the only thing they were perhaps more clear on is that no one should ever reach into the press while someone else was working on the alignment. Phaneuf admits that she knew this latter rule not only as a matter of training, but as one of common sense. Thus, while each machine operator had a teammate to whom she handed the newly pressed soap so that it could be put in a box, only the operator stood near the machine and reached into the press.

In fact, the press was built to ensure that the operator could not accidentally cycle the machine down on his or her own fingers. It did this by placing the two activation buttons several inches from either side of the press and requiring the operator to push down simultaneously on both buttons—which, of course, required both hands—in order to cycle the machine. That feature prevented an operator from cycling the press with one hand while the other hand remained in the press.

Unfortunately, this feature can protect only a single operator. So when Phaneuf reached over Collins's shoulder and into the press, there was no failsafe to protect her from what happened next: hearing Everett's comments that the machine was not aligned, Collins mutely and without looking at the press itself pushed both buttons to check the alignment once more. A split-second later, three of the fingers on Phaneuf's left hand were severed.

Had Collins been looking at the press, he could have clearly seen that Phaneuf had put her hand into it. Phaneuf emphasizes that the work safety rules admonish that MSI workers should "[k]eep alert to what [they] are doing" and warns that "looking away" is a "major cause of accidents." And Collins admits that operating the machine while looking away violated "basic safety rules."

The parties dispute several facts surrounding the final seconds of the accident. Phaneuf says that Collins was standing at the time of the accident and was looking to his right in the general direction of "two girls" working on another assembly line, though she admits she does not know what he was looking at. Several other inmates confirm that Collins was looking to the right. One

4

inmate goes further, stating that Collins was admiring a young female inmate named Layla; this testimony, though, does not explain how the inmate knew what or who Collins was looking at.

By contrast, Collins says that he was looking to his left, and not at Layla but at Everett as a part of his response to Everett's comment about the press's alignment. He also testifies that he was on his knees at the time of the accident, finishing up the final touches of the second alignment step. Several of the inmates confirmed that he was not standing, though none of them supported his account that he was looking to the left.

Regardless of these factual conflicts, both parties and all the witnesses agree that Collins had no idea that Phaneuf's hand was in the press when he pushed the buttons. Phaneuf testified that she did not tell him she was reaching into the press and agreed, in part because Collins was looking away, that she had no "reason to believe he knew that [she] w[as] doing that." Collins goes further, emphasizing that "the key point for me is [that operating the press is] a one person operation. If I am operating, no one—no one should be in that space." And because of this iron-clad work rule, Collins concludes that "I would never have thought—in ten years no one has ever put their hand near or in there. . . . So I would have never thought that someone would put their hand in that pinch point."

**B**

Two years after the accident, Phaneuf sued Collins in state court for her injury, bringing both a Michigan state law claim and a claim based on the Eighth Amendment to the United States Constitution. Collins removed the case to federal court on the basis of federal question jurisdiction. He filed a motion for summary judgment against both claims and asked alternatively that the district

court decline supplemental jurisdiction over the state law claim if it rejected the Eighth Amendment claim. Phaneuf argued in opposition that there were disputed issues of fact, that the record permitted a reasonable jury to find for her, and claimed that Collins's failure to properly attend to her safety was partially driven by Collins's racism against whites. (Collins is black and Phaneuf white.)

Stating that it was taking the facts in the light most favorable to Phaneuf, the district court agreed that the soap press objectively presented a "substantial risk of injury" and that Collins "may very well" have been negligent in calibrating the press. But the district court found that even if Phaneuf proved all of the facts she alleged, she did not "even come close" to meeting the "deliberate indifference" standard required for the Eighth Amendment claim. After noting that efficiency counseled exercising supplemental jurisdiction over the state law claim, the district court further found that the evidence could not show that Collins was "reckless" or that he had demonstrated "a lack of concern for the plaintiff in this particular matter," meaning that Phaneuf could not meet the state law claim's "gross negligence" standard. Thus, the district court granted Collins summary judgment.

Phaneuf makes several arguments for reversal on appeal. She argues first that the district court improperly articulated and applied both the Eighth Amendment "deliberate indifference" standard and the state law "gross negligence" standard. Next, she argues that disputed issues of fact prevent summary judgment on either claim, adding as one of her disputed issues whether Collins was looking at Layla with "prurient" intent at the time of the accident. Finally, Phaneuf asserts that the district court should have declined supplemental jurisdiction over the state law claim.

## II

## A

We review de novo the district court's grant of summary judgment. *Spees v. James Marine, Inc.*, 617 F.3d 380, 388 (6th Cir. 2010). Summary judgment is proper where the moving party shows both that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Id.* (citing Fed. R. Civ. P. 56(c)(2)). In reviewing this case, we must view the facts and all reasonable factual inferences in Phaneuf's favor. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The ultimate question before us is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## B

The Eighth Amendment, in relevant part, bans "cruel and unusual punishments" by federal officials against criminals. U.S. Const. amend VIII. This ban applies to state officials through the Due Process Clause of the Fourteenth Amendment. *Wilson v. Seiter*, 501 U.S. 294, 296 (1991). While the Eighth Amendment's text focuses on prohibiting certain kinds of punishments, the Supreme Court has interpreted it to be a source of liability for government agents who cause significant harm to prison inmates even where the harm was not caused as a part of the inmates' decreed punishment for crime. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (making this change by emphasizing the "evolving standards of decency that mark the progress of a maturing society" instead of the amendment's text). To avoid straying too far from the text, the Supreme Court found

7

the prison official must have had a culpable state of mind in inflicting that harm. *Wilson*, 501 U.S. at 299 (noting that "[t]he source of the intent requirement is not the predilections of this Court, but the Eighth Amendment itself, which bans only cruel and unusual *punishment*"). And to be sufficiently culpable, the defendant official must have committed an act that reflected "obduracy and wantonness, not inadvertence or error in good faith." *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). Only an act committed with this mental state can adequately "evince deliberateness tantamount to intent to punish." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 812 (6th Cir. 2005) (internal quotation marks and citation omitted).

The meaning of "obduracy and wantonness" differs depending on context. In quelling a prison riot, it means malicious and sadistic efforts to cause physical pain; in attending to an inmate's medical needs, it means showing deliberate indifference to those needs. *Wilson*, 501 U.S. at 302. Here, the parties agree that "obduracy and wantonness" is judged by the deliberate indifference standard.

So what is "deliberate indifference"? For starters, it is more than negligence but less than purposeful harm. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). Thus, a mere accident does not constitute deliberate indifference because it lacks a sufficiently penal-like intent. *Estelle*, 429 U.S. at 291 ("An accident, although it may produce added anguish, is not on that basis alone to be characterized as a wanton infliction of unnecessary pain."); *accord Wilson*, 501 U.S. at 301 ("The infliction of punishment is a deliberate act intended to chastise or deter. . . . If a guard accidentally stepped on a prisoner's toe and broke it, this would not be punishment in anything remotely like the accepted meaning of the word[.]" (internal edits, quotation marks, and citations omitted)). But, on

8

the other end of the spectrum, deliberate indifference does not require a showing that the official either sadistically intended to cause harm or that he acted knowing it would cause harm. *Farmer*, 511 U.S. at 835.

More precisely, deliberate indifference is akin to criminal recklessness—that is, *knowingly* taking an unjustifiably high risk of causing serious harm. *Id.* at 836. Thus, the test for determining deliberate indifference is whether "the official knows of and disregards an excessive risk to inmate health or safety," which in turn requires a showing that the official was both "aware of facts from which the inference could be drawn that a substantial risk of harm exists" and that he actually "dr[e]w the inference." *Id.* at 837. Crucially, this means that an inmate must prove that the official actually perceived and yet still intentionally disregarded the substantial risk of serious harm that led to the inmate's injury. *Miller*, 408 F.3d at 813. And the inmate must meet this burden by a preponderance of the evidence. *Brooks v. Celeste*, 39 F.3d 125, 127 (6th Cir. 1994).

Applying that standard to the facts of this case, we must conclude that Collins was not deliberately indifferent to Phaneuf's safety. He had no idea that Phaneuf had put her fingers in the press and no reason to think that she or anyone else *would* do so. In fact, he had at least two good reasons to think that neither Phaneuf's fingers nor anyone else's were in the press at the time he cycled it. The first reason is the iron-clad rule that only one person operates the press at a time, a rule that Collins knew Phaneuf (and all the other inmates) understood and one that long-unbroken experience taught him was faithfully followed. The second reason was the simple reality of the machine's configuration: situated on a large table with a recessed area just large enough to accommodate the operator, the press is a small part that is located between the operator's hands and

9

directly in front of his body. Just as a person sitting with his hands on either side of his keyboard and gazing out a side window can be reasonably certain no one is surreptitiously typing on his keyboard in front of him, Collins was in a physical position that gave him the reasonable belief that no one's fingers were in the press. And that is precisely what he testified was his state of mind. His testimony is not only uncontradicted in the record, it is repeatedly affirmed by Phaneuf and others via their affirmations that they had no reason to think Collins was aware Phaneuf's fingers were in the press.

Phaneuf counters with two arguments. First, she asserts that Collins *was* aware of the significant risk posed by cycling the press while looking away. But this counter is doubly misleading. To begin with, the primary quote from Collins's deposition that Phaneuf uses show his awareness is taken out of context and used mendaciously. Phaneuf Br. at 28.[1] What Collins actually said was that it was a significant risk *for anyone other than the operator to put his or her hands near*

---

[1] Phaneuf's brief states: "Likewise, Collins testified to subjective knowledge of the excessive risk of injury for anyone standing near the operator, [sic] when activating the press while looking away." Phaneuf Br. at 28. It then quotes from Collins's deposition: "Q: And you were aware of that risk at the time you activated the press while you were not looking at the press, correct? A: I was aware of the risk – I'm always aware of the risk . . ." *Id.* at 28-29. But this is the full context of Collins's statement:

> **Collins**: And again, the key point for me is [that operating the press is] a one-person operation. If I am operating, no one—no one should be in that space.
> **Q**: And that's because there would be an excessive risk of injury to do otherwise. Is that correct?
> **Collins**: Correct.
> **Q**: And you were aware of that risk at the time you activated the press while you were not looking at the press, correct?
> **Collins**: I was aware of the risk—I'm always aware of the risk. But I would never have thought—in ten years no one has ever put their hand near or in there in ten years. I never done [sic] it. So, I would have never thought that someone would put their hand in that pinch point.

Further, just before this exchange, Collins testified that he did *not* think that activating the press while looking away from the pinch point was particularly dangerous.

*the press*, that it was precisely to alleviate this risk that only one person was allowed to work on the press at a time, and thus that he "would have never thought" that Phaneuf or anyone else would violate that rule. Collins, then, was expressing the exact opposite of what Phaneuf misquotes him to be saying: not that he was aware of the risk, but that he absolutely was not and had no reason to be so.

The other problem with Phaneuf's first argument is that it generalizes too much. Yes, Collins knew that operating the press was risky. Hence the one-operator rule. But what he did not know, and what the *Farmer* test requires him to know, is that Phaneuf was going to or was at least *likely* to put her hands on the press while he was still operating it. Indeed, Phaneuf apparently could see his hands were on the activation buttons when she put her fingers in the press; how any reasonable person could have anticipated Phaneuf's act in light of that fact is a mystery. Further, generalizing the *Farmer* test to focus on an action's level of inherent risk instead of the specific circumstances of the risk is not only unwarranted, it is impractical. Consider a situation where a prison guard is driving through a prison complex, momentarily takes his eyes off the road, and accidentally hits a prisoner who was in a place she was neither allowed nor expected to be. Phaneuf would say the guard was deliberately indifferent simply because the inherent danger of driving should have counseled him to never take his eyes off the road. But in truth, as understood from the specific facts of the situation, the guard would have been merely negligent and obviously not acting with a quasi-penal intent. The same is true here: Collins may have been negligent, but he did not have anything approaching the type of mental state necessary to show deliberate indifference.

This is also why it is not dispositive that Collins admitted that running the press while looking away violated "basic safety rules." That Collins admitted to this error alone could only mean that he was negligent (like a driver taking his eyes off an unpopulated road), not that he was deliberately indifferent (like a driver choosing to drive on the sidewalk instead of the road).

Phaneuf's second argument is that genuine disputes of material fact prevent summary judgment. But though she is certainly right that there are genuinely disputed facts, each of them (whether Collins was looking to his right at Layla or his left at Everett, whether he was standing or kneeling) is relevant only to a single question: Did Collins see Phaneuf's hand in the press or otherwise have any reason at all to think her hand was in the press? Because the clear and undisputed answer is "no," the factual disputes are immaterial.

Thus, Collins did not violate Phaneuf's Eighth Amendment rights. But his case is stronger yet because of his qualified immunity defense. Even if Collins's actions raised a close enough question that a jury should consider this case, qualified immunity still counsels granting summary judgment. Phaneuf did not identify a single United States Supreme Court case, Sixth Circuit case, or any other case that would have put Collins on notice that looking away for a moment from the machine he was operating violated the Eighth Amendment. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (noting that qualified immunity ensures that officers can only be liable if pre-existing law gives reasonably clear notice that their conduct is unlawful). The case on which Phaneuf most relies is *Farmer*, but that case was about prison rape, not industrial accidents, and it hardly provides clear guidance on the facts of this case. Phaneuf also offers *Hall v. Bennett*, 379 F.3d 462 (7th Cir. 2004), but that case is easily distinguishable. In *Hall*, the court found that the injured inmate had been

12

ordered to engage in an inherently dangerous act by prison officials (stripping the insulation off a live high-voltage wire) after providing them sufficient notice that he did not have the training to do it and after he requested that the officials follow an explicit prison safety rule that required turning off the power before working on the wires. *Id.* at 463, 465. Further, the officials refused to give the inmate protective rubber gloves even after he asked for them. *Id.* By contrast, not only did no one order Phaneuf to stick her fingers into the press, she violated official rules by doing so. Thus, in the absence of any clearly applicable law giving him "fair warning" that his actions were unconstitutional, Collins must receive qualified immunity. *See Hope*, 536 U.S. at 741.

Qualified immunity also addresses Phaneuf's argument that violating the MSI safety warning against "looking away" means Collins violated the Eighth Amendment. Even assuming that the safety warning was a rule applicable to Collins's actions in this situation, officials "do not lose their qualified immunity merely because their conduct violates some . . . administrative provision." *Davis v. Sherer*, 468 U.S. 183, 194 (1984).

## C

That leaves the Michigan state law claim. Strangely, the first argument Phaneuf makes regarding that claim is that the district court should not have reached it at all after dismissing the federal claim on which the district court's jurisdiction was originally based. This is odd because it was Collins, not Phaneuf, who urged the district court to decline to exercise supplemental jurisdiction. Thus, it is not clear that Phaneuf is the correct party to raise this particular challenge. In any event, there is no question that the district court did not abuse the "broad discretion" it had over whether to exercise supplemental jurisdiction. *See Musson Theatrical, Inc. v. Fed. Express*

13

*Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). Just because the federal question that provided jurisdiction in the first place has been dismissed does not mean that the entire remaining case must be. *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012). Rather, in such a circumstance, the district court "may" choose to exercise jurisdiction over associated state law claims. 28 U.S.C. § 1367(c)(3). Phaneuf provides no persuasive reason why the district court made the wrong choice, and the district court's rationale—that the issue had been fully briefed and it did not make sense to force the parties to relitigate the matter before another court—is reasonable, especially since the relevant state law analysis closely tracks the Eighth Amendment issue.

Phaneuf's next argument is that the district court got that state law analysis wrong, mixing up the Eighth Amendment "deliberate indifference" standard with the state law "gross negligence" standard. Further, she argues, the lower gross negligence standard makes this question a close one, which, under Michigan law, means that it must be decided by the jury. In support, Phaneuf posits that Collins should have taken several safety measures to prevent the accident, and that he did not do so proves his gross negligence. Specifically, she offers expert testimony that Collins should have: (1) said "clear" just before cycling the press; (2) ordered Phaneuf to stand back; and (3) not cycled the press again after saying it was "good to go."

Phaneuf is right that the standards are different, and she is right that close questions must go to a jury. But she is wrong that this is a close question. As this Court has explained, and as the district court correctly stated, Michigan law interprets "gross negligence" to mean "willful, wanton, or reckless misconduct" and requires "proof of conduct 'so reckless as to demonstrate a substantial lack of concern for whether an injury results.'" *Reilly v. Vadlamudi*, 680 F.3d 617, 627 (6th Cir.

2012) (quoting *Dedes v. Asch*, 521 N.W.2d 488, 493 (Mich. 1994), *overruled on other grounds by Robinson v. City of Detroit*, 613 N.W.2d 307 (Mich. 2000); and *Maiden v. Rozwood*, 597 N.W.2d 817, 824 (Mich. 1999)) (internal quotation marks omitted). And proof of "ordinary negligence does not create a material question of fact concerning gross negligence." *Reilly*, 680 F.3d at 627 (quoting *Maiden*, 597 N.W.2d at 824). Rather, the plaintiff must show that "if an objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge." *Reilly*, 680 F.3d at 627 (quoting *Tarlea v. Crabtree*, 687 N.W.2d 333, 339 (Mich. Ct. App. 2004)).

There is no proof that Collins "simply did not care" about Phaneuf's safety. He was perhaps negligent, but there is nothing to suggest that he had any inkling that his actions threatened Phaneuf in any way and, further, no evidence that he would have still cycled the machine had he had such an inkling. Rather, the clear, uncontested record shows he fully and reasonably expected that no one was put in danger by his actions, and he was only wrong in that estimation because Phaneuf broke the safety rule that everyone knew not to break. That alone forecloses the claim.

Moreover, even if it were necessary to consider them, there are problems with all of Phaneuf's expert's proposed safety measures. Saying "clear" was hardly an option: each press was operated almost 6,000 times a day, and there were four presses in use in the room. Twenty-four thousand repetitions of "clear" per day would have likely caused only sore throats and dulled minds, not safer fingers. Nor would ordering Phaneuf to stand back have helped. Phaneuf herself testified repeatedly—and her lawyer confirmed—that, due to the setup of the presses, someone standing close to the operator was "not in any danger." Also, the record shows that while Collins was aware from

Everett's comment that Phaneuf had returned from the bathroom and was nearby, he did not know how close she was standing at the time of the accident. Thus, he could hardly have had sufficient awareness of her proximity to have somehow been grossly negligent about her safety because she was standing too close to him. Finally, as for not cycling the press after saying it was "good to go," the record shows that this cycling was precisely to test the truth of Everett's response that the press was not, in fact, aligned. Given that cycling the press is the "best" way to test alignment, Collins's decision to so test Everett's response was reasonable. Further, regardless of the response, Phaneuf still had no business sticking her fingers in the press while Collins was the operator, and thus Collins still had no reason to think his manner of testing Everett's assertion could have harmed Phaneuf.

**III**

For the foregoing reasons, we **AFFIRM** the judgment of the district court.