In the

# United States Court of Appeals
## For the Seventh Circuit

No. 16-2899

ESTATE OF DENNIS SIMPSON, *et al.*,

*Plaintiffs-Appellants*,

*v.*

MARK E. GORBETT, JAMES TINDELL, JARED WILLIAMS, JOHNNY YORK, TRAVIS HARBAUGH, and CORY LEHMAN,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:14-cv-01035-SEB-MJD — **Sarah Evans Barker**, *Judge*.

ARGUED JANUARY 6, 2017 — DECIDED JULY 14, 2017

Before WOOD, *Chief Judge*, and BAUER and ROVNER, *Circuit Judges*.

WOOD, *Chief Judge*. This case concerns the death of Dennis Simpson, an inmate who fell off an upper bunk while incarcerated in the Bartholomew County Jail for a drunken driving conviction. Simpson was intoxicated when he reported to the jail to serve his weekend stay, prompting officers initially to place him in a holding cell. After they thought he was sober,

they assigned him to an upper bunk in a two-person cell, even though he was obviously obese. While sleeping, Simpson went into convulsions and fell off the bunk on to the hard concrete floor. He died from his injuries.

His estate sued six county employees—five officers and the sheriff—arguing that the conditions under which the jail kept Simpson and the care he received were inadequate under the Eighth Amendment. The district court found there was insufficient evidence to show the defendants were aware of, but disregarded, a risk to Simpson's health and safety, and so granted them summary judgment. We affirm.

**I**

Simpson reported to the Bartholomew County Jail around 10:30 a.m. on Friday, November 29, 2013. He was there to serve his second of three weekends of confinement as punishment for a May 2013 drunk driving violation. Anyone could see that Simpson was obese. Although the officers did not know Simpson's precise weight (368 pounds) because they did not weigh him at check-in, one of the defendants correctly guessed that Simpson weighed between 350 and 400 pounds.

Simpson also was intoxicated that morning. The deputy processing him upon his arrival, Officer Johnny York, smelled alcohol on Simpson's breath. York tested Simpson's blood alcohol content (BAC), and found it was 0.23%, just short of three times Indiana's legal limit for driving. York notified his supervisor, Sergeant James Tindell, who in turn asked Simpson whether he was experiencing withdrawal symptoms. Simpson said he was not. Bartholomew County Jail policy called for intoxicated inmates with BACs under 0.25% to be placed in holding cells until they were sober. In

accordance with that rule, Simpson was placed in a holding cell containing only benches—no beds. At some point Simpson complained to York about his placement, to no avail. York responded that Simpson was too intoxicated to be placed in a cell with bunk beds at that time. York served Simpson lunch around 11:20 a.m.; this was apparently the last time those two had contact. Officer Travis Harbaugh, another defendant, replaced York that evening. At some point when Harbaugh checked on Simpson, Simpson reported that he had blood in his stool. Harbaugh informed a supervising officer, Jared Williams, about Simpson's condition.

Around 11:30 p.m., Harbaugh moved Simpson to a cell that had two bunk beds. Harbaugh and York said that it was common practice to use a burn-off chart to estimate how many hours it takes a person's blood alcohol level to reach zero. (While blood-alcohol content is certainly relevant in these situations, if the person is an alcoholic, so are withdrawal symptoms such as delirium tremens; the latter symptoms do not normally manifest themselves until withdrawal happens—that is, when BAC nears zero. We address this briefly below.) At the time of transfer, the defendants apparently believed Simpson was sober, although they did not retest him. The lower bunk in Simpson's new cell was occupied, and so Simpson was given the upper bunk. Simpson's bed was affixed to a wall of the jail cell a little more than four feet off the ground. It was only 30 inches wide. (To put this in context, we note that a standard twin bed is about 25% wider, at 38 inches.)

Simpson slept on his assigned upper bunk for some time. But around 3:15 a.m., he suddenly began experiencing seizure-like convulsions. He rolled out of the bunk and fell to the

concrete floor, hitting his head. Officers Harbaugh and Cory Lehman witnessed Simpson's fall and ran into the cell to check on him. Finding him unresponsive, they performed CPR on him until paramedics arrived and rushed him to a nearby emergency room, where he was pronounced dead at 4 a.m. For the purposes of the summary judgment motion, the defendants concede that Simpson died of injuries sustained from his fall, and that his fall was precipitated by an alcohol withdrawal seizure.

Simpson's estate asserts that at the time of Simpson's fall, jail policy "required inmates weighing more than 350 pounds to be placed in lower bunks." It supports this contention with an indirect citation to an undated order apparently from the Bartholomew County Sheriff's Department concerning the jail's medical care policies for inmates. But the only indication of any such policy comes from Advanced Correctional Healthcare, which did not enter into a contract to provide medical services for the jail until November 2013. Thus, we see no evidentiary support for the Estate's contention that jail policy called for obese inmates to be given lower bunks and accordingly disregard that possibility.

After Advanced Correctional came on the scene, which was several months after Simpon's death, it promulgated medical guidelines for the jail. Included in the Advanced Correctional guidelines was a list of "criteria for Bottom Bunks." The list called for certain people to be given lower bunks, including inmates who are elderly, have diagnosed seizures or diabetes, or, as relevant here, were obese, defined as weighing over 350 pounds. Another rule called on the facility to "[a]ddress 'serious' medical, dental, and mental health issues."

In the wake of Simpson's unfortunate death, Simpson's son, Devon Simpson, and sister, Gloria Skinner, brought this section 1983 action against six county officials in their individual and official capacities, on Simpson's behalf as representatives of his estate. The lawsuit named as defendants Sheriff Mark E. Gorbett—the head of the jail—and deputies York, Williams, Harbaugh, Lehman, and Tindell. The complaint alleged that the defendants were deliberately indifferent to Simpson's serious medical needs and that they subjected him to inhumane conditions of confinement, in violation of the Eighth Amendment. The district court construed the Estate's deliberate indifference claim as embracing three theories of liability: one concerning the conditions of Simpson's confinement, another concerning the failure to provide adequate medical care, and the third against Gorbett in his official capacity for failure to train adequately his deputies.

The defendants filed a motion for summary judgment on September 21, 2015. The district court granted the motion on June 22, 2016, for all defendants and all claims. Lehman and Williams prevailed because, as the Estate acknowledged, neither officer had been involved with Simpson's care before his fall. York, Tindell, and Harbaugh were entitled to summary judgment on the official capacity claims because those claims duplicated the official capacity claim against Sheriff Gorbett, who was in charge of the jail. The Estate's claim against Gorbett in his individual capacity foundered because Gorbett was not personally involved in Simpson's care.

That left the individual capacity claims against York, Tindell, and Harbaugh, and the official capacity claim against

Gorbett for failure to train employees about how to care for drunken or obese inmates. The court found no evidence that would allow a factfinder to conclude that the deputies were deliberately indifferent in the care they rendered and the conditions of Simpson's confinement. Finally, it dismissed the official-capacity claim against Sheriff Gorbett on the ground that no evidence in the record could support a finding that a top-bunk assignment posed a substantial risk to obese inmates, and so the sheriff could not be liable for failing to train his officers about such a risk.

## II

The Estate appeals from the district court's adverse rulings on its claims of deliberate indifference for failure to provide adequate medical care claims and constitutionally defective conditions of confinement claims. (It does not appeal the rejection of its failure-to-train claim.) It is not clear which defendants, and in what capacity, its appeal covers. Nonetheless, with the failure-to-train claim out of the case, the duplicative nature of the official-capacity claims indisputable, and the acknowledged fact that Lehman, Williams, and Gorbett were not personally involved in Simpson's care, we conclude that this appeal can be limited to the individual-capacity claims against York, Tindell, and Harbaugh (the "deputy defendants").

Because this is an appeal from the grant of summary judgment, our consideration of the case is *de novo*. *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016). We evaluate the record in the light most favorable to the non-movant, the Estate, and draw all inferences in its favor. *Id*. Summary judgment is warranted if the movant "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A

We turn first to the conditions of Simpson's confinement. The Estate contends that the deputies' assignment of Simpson—a drunk and obese man—to the two-and-a-half foot wide upper bunk was unsafe and inhumane. A jail's conditions violate the Eighth Amendment when "(1) there is a deprivation that is, from an objective standpoint, sufficiently serious that it results in the denial of the minimal civilized measure of life's necessities, and (2) where [jail] officials are deliberately indifferent to this state of affairs." *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (internal quotation marks omitted) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

We begin with the first requirement. Unacceptable conditions include those that pose a "substantial risk to inmate health or safety." See *Farmer*, 511 U.S. at 837; *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). Jail conditions "may be uncomfortable, even harsh, without being inhumane." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664–65 (7th Cir. 2012) (citing *Farmer*, 511 U.S. at 832). This means that to defeat summary judgment the plaintiff must show that a factfinder reasonably could conclude that the conditions of Simpson's confinement "exceeded mere discomfort and were constitutionally unacceptable." *Rice*, 675 F.3d at 664–65.

Before we can analyze the Estate's claim, we must give a more precise account of the relevant conditions of confinement. The Estate contends that Simpson was drunk when the defendants transferred him to the upper bunk. But the record does not permit that inference. While Simpson indisputably was intoxicated when he reported to Bartholomew Jail, the deputy defendants kept Simpson in the holding cell for nearly 13 hours to give his body what they believed was sufficient time to process the alcohol in his system. The Estate provides no evidence that Simpson was *still* intoxicated when he finally was given a bed. Although it challenged the accuracy of the "burn off" chart because the document did not account for Simpson's obesity, it has not revived that attack here. That is just as well: whether the chart is a good general guide is not enough, by itself, to show what *Simpson*'s blood-alcohol level was when he was moved. A plaintiff must meet a motion for summary judgment with evidentiary materials that show there is a genuine issue for trial. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). The Estate has failed to do so with respect to Simpson's intoxication at the time of the bunk assignment.

The record does support a finding that the officers assigned Simpson, a visibly obese man who had been highly intoxicated 13 hours earlier, to the narrow upper bunk. We assume that there are some circumstances where a small, elevated bed might pose a "substantial risk of serious harm" to an inmate's health or safety. *Farmer*, 511 U.S. at 834. But the Estate has not provided evidence that (if accepted) would show the requisite level of risk and harm here. We do not understand the Estate to be arguing that 30-inch bunks, or top bunks, are unconstitutional for all inmates; the Estate is chal-

lenging the assignment of a morbidly obese man to this nar-row, upper bed. But its argument that the bunk was unreason-ably dangerous to Simpson rests almost entirely on hind-sight—that is, what happened after Simpson had been sleep-ing in apparent safety for several hours, when he suddenly had convulsions, tumbled off, and suffered his fatal injury. But because our inquiry is objective, we cannot base our con-clusion exclusively on what came to pass. Based on this rec-ord, we cannot conclude that Simpson's bunk assignment ob-jectively was so dangerous that it denied Simpson "the mini-mal civilized measure of life's necessities." *Id*. (internal cita-tion omitted).

The bottom-bunk policy does not save the Estate's claim, even if we were to assume that it was in place at the time of Simpson's fall. Section 1983 protects against "constitutional violations, not violations of … departmental regulation and … practices[.]" *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003). The Estate argues that a jury could use the policy as circumstantial evidence of the defendants' knowledge of the risk. It is mistaken. It is one thing to say that circumstantial evidence may support an inference that the defendants had actual knowledge of a condition, see *Farmer*, 511 U.S. at 842; *Hall v. Bennett*, 379 F.3d 462, 464 (7th Cir. 2004), but it is quite another thing to say that the policy also supports an inference that the defendants knew that the condition in question was unreasonably dangerous or otherwise in violation of the Eighth Amendment.

In any event, even if we were to assume that a trier of fact could find in the Estate's favor on the objective part of the con-stitutional inquiry, it would still be out of luck. A jail or prison

official may be found liable only if he "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 838. This means that the defendants must have acted with more than simple or even gross negligence, although they do not need to act purposefully or knowingly inflict harm. *Washington v. LaPorte Cnty. Sherriff's Dep't*, 306 F.3d 515, 518 (7th Cir. 2002). The requisite level of knowledge may be inferred in instances where the risk posed by the condition is obvious. *Farmer*, 511 U.S. at 842; *Hall*, 379 F.3d at 464.

There is a dearth of evidence suggesting deliberate indifference. Even if we assume that assigning a man as large as Simpson, who obviously had an alcohol problem, to a narrow top bunk was objectively dangerous, there is no indication that the deputy defendants were aware of the risk posed by that assignment or that they knew the risk was excessive. The Estate argues that a factfinder could infer the requisite knowledge because it was plain at a glance that Simpson's bed was too small to accommodate his frame. But there is a difference between discomfort and danger, and that glance could not reveal to the deputies whether the poor fit created a "substantial risk." See *Farmer*, 511 U.S. at 844. The Eighth Amendment demands that officials ensure "reasonable safety," not that they protect against all risks. *Id.* at 844–45. The risk of injury from a fall onto a concrete floor is obvious, but the chance that someone would fall is not. Perhaps tellingly, the record reveals no evidence showing that other obese inmates (or others suffering from alcohol withdrawal) fell off their bunks in Bartholomew Jail, or that anyone else sustained serious injuries. The rule is that an official who should have, but failed, to perceive a significant risk cannot be held liable. See *id.* at 838. It applies to these defendants.

B

That leaves us with the Estate's Eighth Amendment deliberate-indifference claims for failure to provide adequate medical care for Simpson's obesity and alcoholism. Because the Eighth Amendment requires that inmates receive adequate medical care, officials violate the Constitution when they are deliberately indifferent to inmates' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976). A claim of deficient medical care requires proof of an objectively serious medical condition, and the official's deliberate indifference to that condition. *Duckworth v. Ahmed*, 532 F.3d 675, 679 (7th Cir. 2008). The defendants concede that Simpson's obesity and alcoholism were objectively serious medical conditions. We thus turn immediately to the deliberate-indifference inquiry. See *Zentmyer v. Kendall Cnty., Ill.*, 220 F.3d 805, 810 (7th Cir. 2000).

The plaintiff has the burden of demonstrating that there is evidence from which a factfinder could conclude that the defendants acted with a sufficiently culpable state of mind. *Farmer*, 511 U.S. at 834. In deliberate-indifference claims based on inadequate medical care, one way of satisfying that burden is to show that the risk from a course of treatment—or a lack of treatment—is obvious enough that a factfinder could infer that the defendant knew about the risk, yet disregarded it. *Petties*, 836 F.3d at 729. We take into account what risk the defendants knew of, and whether the treatment they rendered "was so far afield" from what one would expect that a jury could infer deliberate indifference. *Duckworth*, 532 F.3d at 680.

We begin with the deputies' response to Simpson's obesity. Although they did not know about his medical diagnosis or his precise weight, a reasonable jury could conclude that the

defendants knew Simpson was obese based on his physical appearance. But the Estate leaves us in the dark as to what risk Simpson's obesity presented or what care the deputy defendants should have furnished to Simpson during his weekend stay. Perhaps the Estate believes that Simpson should have been given a lower bunk or no bunk altogether; but if this is so, it has just re-stated its conditions-of-confinement claim. We cannot discern a free-standing medical-treatment claim related to obesity. In the absence of some indication of what care was owed, but not rendered, the defendants cannot be held liable.

The Estate's claims regarding Simpson's intoxication and "chronic alcoholism" come closer to the mark, but in the end they fare no better. The Estate marshals no evidence to suggest that Officers York, Tindell, and Lehman knew that Simpson was an alcoholic. They knew only—at most—that he was serving a relatively lenient sentence for driving while intoxicated, and that he was inebriated when he showed up for his second weekend. Absent any indication that the defendants knew that Simpson was addicted to alcohol and thus was likely to suffer from serious withdrawal symptoms, we may consider only whether a jury could find that the deputies rendered constitutionally defective care for his intoxication.

We conclude, as did the district court, that this record would not support such a finding. The undisputed record shows that the defendants tailored their care for Simpson to account for his intoxication. After Officer York smelled alcohol on Simpson's breath, he promptly tested his alcohol level and notified his supervisor, Tindell, of the result. In turn, Tindell asked Simpson if he was experiencing any withdrawal

symptoms. Simpson said no. The deputies then held Simpson in a bunk-less holding cell for more than half a day, until they believed he was sober. They did not observe Simpson exhibiting any signs of distress during this time.

Unfortunately, the risk posed by Simpson's intoxication did not pass as he sobered. Withdrawal symptoms may occur hours, if not days, after a heavy, long-term drinker stops or reduces his alcohol consumption—long after his blood-alcohol level zeroes out. See, *e.g.*, Louis A. Trevisan *et al.*, *Complications of Alcohol Withdrawal*, 22 ALCOHOL HEALTH & RES. WORLD 61, 62 (1998); Marc A. Schuckit, *Recognition and Management of Withdrawal Delirium (Delirium Tremens)*, 371 NEW ENG. J. MED. 2109, 2109–10 (2014). Seizures most often occur within 48 hours after a person stops drinking alcohol, al-though they may occur several days later. Trevisan, at 62. Other withdrawal symptoms, such as delirium tremens—disturbances in cognition and attention, which may include hallucinations—similarly can manifest days after a dependent person stops consuming. *Id.*; Christopher Pelic & Hugh Myrick, *Who's at Greatest Risk for Delirium Tremens*, 2 CURRENT PSYCHIATRY 14, 17 (2003).

But there is no indication that the deputies were aware of the extent of Simpson's drinking problem, or of the protracted risk period that follows when a heavy drinker experiences withdrawal. In the absence of such evidence, it is impossible to conclude that the defendants were deliberately indifferent. Even the Estate fails to argue what care defendants should have rendered, but did not, for Simpson's intoxication.

### III

Had the deputies known about Simpson's alcoholism and the risk posed by withdrawal, they might have taken additional steps to protect Simpson from accidental harm. But in the absence of any indication that they knew of a serious risk, they cannot be held liable under section 1983 for either the conditions of confinement or the medical treatment they provided. We AFFIRM the judgment of the district court.