NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued June 12, 2019
Decided June 14, 2019

**Before**

DIANE P. WOOD, *Chief Judge*

AMY C. BARRETT, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

No. 16-1231

| | |
|---|---|
| ANDERSON R. DASILVA,<br>*Plaintiff-Appellant*, | Appeal from the United States District<br>Court for the Eastern District of Wisconsin. |
| *v.* | No. 14-CV-812 |
| ROBERT J. RYMARKIEWICZ and<br>KRISTINE DEYOUNG,<br>*Defendants-Appellees*. | William E. Duffin,<br>*Magistrate Judge*. |

## O R D E R

Anderson DaSilva, a Wisconsin state inmate, repeatedly asked the district court to recruit counsel for him in his Eighth Amendment deliberate-indifference suit. The district court denied his requests and ultimately granted summary judgment for the defendants. On appeal, DaSilva challenges only the decision not to recruit counsel. Because we conclude that the lack of counsel did not prejudice him, we affirm.

## Background

Reviewing the entry of summary judgment for the defendants, we construe all facts and draw all reasonable inferences in DaSilva's favor. *See Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017).

I.     Factual

After vomiting most of the day on Christmas Eve 2013, Anderson DaSilva fainted in his cell and hit his head, cutting his forehead. His cellmate called for help. By the time Officer Robert Rymarkiewicz arrived, DaSilva was conscious and the bleeding from the cut had slowed.

At about 10:30 p.m., Rymarkiewicz phoned Kristine DeYoung, the prison's on-call nurse, and told her what had happened. He said that the bleeding had been controlled and the cut did not appear to need stitches. Rymarkiewicz also reported that DaSilva was speaking to officials and seemed to be "ok." DeYoung, who was at home, said that she would come examine DaSilva but that it would take her about 30 minutes to get to the prison. She told Rymarkiewicz to get DaSilva to lie down and sip clear fluids, and to call if DaSilva's condition worsened. Although prison policy requires her to, DeYoung did not speak to DaSilva directly.

Back in his cell, DaSilva became dizzy. He got up to vomit and his cut (which had not been bandaged) again began bleeding. His cellmate yelled for help. Rymarkiewicz returned to DaSilva's cell and ordered other officers to phone DeYoung.

At about 11:30 p.m., Rymarkiewicz again spoke with DeYoung, who was still at home. This time DeYoung asked to speak with DaSilva, but Rymarkiewicz told her that DaSilva spoke mostly Spanish. The officials agreed that DaSilva should be taken to the emergency room. He arrived at the hospital shortly after midnight, about an hour and a half after his fall. Medical staff diagnosed him with a concussion and a small laceration, which they stapled closed. Hospital records note that the cut was not actively bleeding and that DaSilva's speech and motor skills were normal. He was discharged about an hour later in stable condition. For several weeks after the injury, DaSilva complained of headaches, vomiting, and dizziness.

II.    Procedural

In 2014, DaSilva filed a *pro se* complaint under 42 U.S.C. § 1983, alleging that Rymarkiewicz and DeYoung had violated the Eighth Amendment and Wisconsin law by delaying medical treatment for his injury and exposing him to a "threat of further injury." At the same time, he moved the court to recruit counsel for him. *See* 28 U.S.C. § 1915(e)(1). The motion for counsel included a statement from another inmate—identified as "the writer of these legal papers and helper to the plaintiff"—who noted that DaSilva (a native Portuguese speaker) speaks English well but struggles to use it in

writing. The district court denied the motion because DaSilva had not attached proof of any attempt to secure counsel on his own.

DaSilva soon filed a second motion for counsel, this time supplemented with the required documentation. He asserted that his ability to represent himself was hindered by his incarceration, lack of prison library time, and limited English skills. He also said that his Eighth Amendment claim was "very complicated," and that counsel would be able to retain an expert, investigate his malpractice claim, and question potential witnesses. The district court denied the motion, finding DaSilva competent to litigate on his own. The court noted that his Eighth Amendment claim was "not the type … that often requires expert testimony" because it turned on the parties' personal knowledge about how the defendants treated DaSilva's injury before he was taken to the hospital. As for his state-law claim, the district court said that DaSilva could not compel the government or recruited counsel to bear the cost of hiring an expert.

Shortly thereafter, DaSilva twice moved the district court to order the prison to release "any and all records" relating to his injury and ongoing health issues, explaining that "I already try to get [them] myself but they not even respond my requests." The court denied the motions because DaSilva "failed to adhere to discovery procedures" and because it had no authority to order the prison, a non-party, to respond. It advised DaSilva to try to obtain the information through discovery requests served on the defendants directly. DaSilva promptly filed a series of interrogatories, but he did so with the court, not the defendants.

A few months later, DaSilva filed a third motion for counsel, reiterating that his ability to represent himself was limited by his imprisonment and lack of library access. He added that prison staff had stolen his legal papers, restricted his phone privileges, and failed to turn over his records, and that the inmate who had been assisting him had since been moved. The district court denied the motion, noting the case's "narrow scope" and DaSilva's "ability to communicate effectively" (reflected in his motions and interrogatories). It cautioned DaSilva to adhere to prison policies and "to be patient (within reason)" while the prison processed his records requests, or to avail himself of the internal grievance process or discovery procedures. As for the alleged retaliation, the court noted that "[w]hile frustrating and perhaps unfair, [DaSilva] has not alleged any actions … that have interfered with his ability to … [litigate] on his own."

DaSilva continued to file procedurally defective discovery requests with the court, even after his transfer to a new prison. He also sent the court a letter asking for an attorney, adamant that the prison would "ignore" his record requests if he remained uncounseled. The district court did not respond to the letter, but it denied each of his discovery motions—some for failing to comply with procedural rules and others on the merits (despite procedural errors). DaSilva was eventually able to obtain discovery, including incident reports, answers to interrogatories, and numerous medical records from the hospital and prison.

In fall 2015, the parties filed cross-motions for summary judgment. The defendants moved to strike DaSilva's motion as procedurally deficient. DaSilva responded to the motion to strike and to some but not all of the defendants' proposed facts. He also sent the court a letter, again asking for counsel and explaining that he did not "know how to do Erverythin [sic]" in his case. He added that the court should now have "all [his] medical records," incident reports, answers to his discovery requests, and everything "the defendants sent [him]."

The magistrate judge, proceeding by consent, *see* 28 U.S.C. § 636(c), granted the defendants' summary-judgment motion and denied DaSilva's. In its ruling, the court noted that DaSilva had responded to "only some" of the defendants' proposed facts, so it deemed the rest admitted. It drew additional facts from DaSilva's sworn complaint. The court concluded that his Eighth Amendment claim failed because he could not show that either defendant was deliberately indifferent to his injury. Further, he failed to present evidence establishing that the delay in treatment "had any detrimental effect on him"—a "fatal" omission. The court then dismissed the state-law malpractice claim because DaSilva did not submit expert testimony on the standard of care, as required.

## Analysis

With the assistance of recruited counsel on appeal, DaSilva challenges only the district court's decision not to recruit counsel for him. We review denials of counsel under 28 U.S.C. §1915(e)(1) for an abuse of discretion and will reverse only if prejudice is shown. *Pruitt v. Mote*, 503 F.3d 647, 659 (7th Cir. 2007) (en banc). Here, we need only address the prejudice prong because it is dispositive. *Tidwell v. Hicks*, 791 F.3d 704, 709 (7th Cir. 2015). To succeed on this appeal, DaSilva must show "a *reasonable likelihood* that

the presence of counsel would have made a difference in the outcome of the litigation." *Pruitt*, 503 F.3d at 659 (emphasis in original).

DaSilva argues that his "'poor performance' during discovery and his inability to respond adequately during summary judgment are sufficient to establish prejudice." Regarding his limitations in carrying out discovery, DaSilva points out that instead of seeking medical records through requests made to the defendants, he filed "multiple improper motions with the court." Indeed, counsel might have avoided these missteps, but DaSilva was not prejudiced by them; the defendants still responded to some procedurally deficient motions, and the district court addressed several others on the merits. DaSilva also contends that he "never obtained his full medical records," particularly those documenting his health problems since the incident. But post-injury evidence of this sort is not relevant to whether the defendants' response to his initial injury violated his rights. In any case, as DaSilva himself stated, the district court had "all [of his] medical records" before it ruled on the motions for summary judgment. (DaSilva's motion was accompanied by 49 pages of exhibits—including medical records from the prison and the hospital, some of which document post-injury issues.)

As for his inability to respond at the summary-judgment stage, DaSilva contends that, without counsel, he failed to point out a genuine dispute of material fact in the record. Specifically, he asserts that three hours passed "between the moment his need for medical attention arose and the time he was examined … at the hospital," but the district court accepted the defendants' position that "the entire incident was only an hour and a half." Any dispute over the timeline, however, is not genuine. In his sworn complaint (on which the district court relied for some facts), DaSilva himself stated that he arrived at the hospital "approximately 1 hour and 30 minutes after he initially required emergency medical attention."

To establish an Eighth Amendment claim for deliberate indifference to serious medical needs, DaSilva had to show that he suffered from an objectively serious medical condition and that the defendants were deliberately indifferent to this need. *Wilson v. Adams*, 901 F.3d 816, 820 (7th Cir. 2018). Ultimately, DaSilva lost at summary judgment not because his claim was complex or beyond his capabilities to litigate, but because he cannot establish that either defendant "knew of a substantial risk of harm to [his health] and disregarded the risk." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). As for DeYoung, no reasonable jury could find that her actions were "so far afield from an appropriate medical response … that they fell outside the bounds of her professional judgment." *King v. Kramer*, 680 F.3d 1013, 1019 (7th Cir. 2012). DeYoung's instructions to

return DaSilva to his cell and her failure to examine him must be viewed in light of the information that she had; and it is undisputed that Rymarkiewicz initially told her that DaSilva's bleeding had slowed and that he appeared "ok." As soon as news of his condition changed (e.g., DaSilva vomited and was bleeding again), so did her instructions, and she directed that he be taken to the hospital.

As for Rymarkiewicz, as a non-medical official, he was entitled to defer to DeYoung's professional judgment, *see Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010), and there is no dispute that he did so here. His alleged lie to DeYoung (regarding DaSilva's English abilities) may have prevented the nurse and DaSilva from talking directly, as prison policy required, but no reasonable jury could find that this misstatement alone constituted deliberate indifference. *See Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) (noting that § 1983 "protects against constitutional violations, not violations of departmental regulation and practices") (internal quotation marks omitted).

DaSilva's Eighth Amendment claim is untenable for another reason: he failed to offer any evidence that the delay in treatment "exacerbated [his] injury or unnecessarily prolonged pain." *Petties v. Carter*, 836 F.3d 722, 730–31 (7th Cir. 2016) (en banc). DaSilva argues on appeal that the decision to return him to his cell led him to fall again, which may have "aggravated his condition and prolonged his post-concussive symptoms." But in the district court, DaSilva complained only of the *risk* that he "could have hit his head a second time and suffered a more serious brain injury or died"; he never alleged that further harm actually occurred.

Finally, the district court dismissed DaSilva's state-law medical-malpractice claim because he did not submit expert testimony on the accepted standard of care—an error that counsel likely would have remedied. However, given the evidence in the record, we doubt that DaSilva could have found an expert to opine that the treatment he received fell below the standard of care. Moreover, in Wisconsin, an expert's disagreement with a treatment decision is not enough to establish a claim. *See Nowatske v. Osterloh*, 543 N.W.2d 265, 275–76 (Wis. 1996), *abrogated on other grounds by Nommensen v. Am. Cont'l Ins. Co.*, 629 N.W.2d 301, 313 n.6 (Wis. 2001).

For these reasons, we affirm the judgment.