In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-2697

JAMES COURTNEY,

*Plaintiff-Appellant,*

*v.*

KIMBERLY BUTLER, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:16-cv-01062-NJR — **Nancy J. Rosenstengel**, *Chief Judge*.

ARGUED OCTOBER 26, 2022 — DECIDED MAY 3, 2023

Before ROVNER, HAMILTON, and BRENNAN, *Circuit Judges*.

HAMILTON, *Circuit Judge*. This appeal presents a new question on the scope of the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994), which forecloses civil litigation that would call into question the validity of a state criminal conviction or sentence that has not been set aside. *Heck* extends to civil litigation that would call into question the validity of a parole revocation, at least when the revocation is based on the parolee's wrongdoing. *Knowlin v. Thompson*, 207

F.3d 907, 909 (7th Cir. 2000). The new question here is whether and how *Heck* applies when release on parole is denied based not on the parolee's actions but on state officials' alleged failures to do their jobs.

Plaintiff James Courtney was sentenced to three years in state prison followed by one year of "mandatory supervised release," the current name for parole in Illinois. But in a practice known as "violating at the door," Courtney's mandatory supervised release was revoked before he ever left prison. The stated reason was not that he had acted wrongly in some way but that he had no arrangements for a place to live that state officials deemed suitable. Courtney spent the one year of his "mandatory supervised release" in prison.

Courtney then brought this suit under 42 U.S.C. § 1983 against current and former administrators of the Illinois Department of Corrections and the Menard Correctional Center. He alleges that defendants failed to investigate living arrangements that he proposed and ignored his grievances. He also alleges that his mandatory supervised release was revoked without evidence that he violated any terms of release and without adequate procedural protections, all in violation of his constitutional rights. The district court dismissed all of Courtney's claims as barred by *Heck v. Humphrey*. We affirm in part and reverse in part and remand for further proceedings on Courtney's claims that state officials failed to do their jobs so that he could be paroled.

I.   *Factual and Procedural History*

We review dismissal of Courtney's complaint de novo, accepting as true the facts alleged in his complaint and giving him the benefit of all reasonable inferences from those

allegations. *Knowlin*, 207 F.3d at 907. Because Courtney appeals from dismissal of his complaint, he may rely on documents outside his complaint to "elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings." *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 n.2 (7th Cir. 2021), quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

### A.  *Plaintiff's Delayed Release*

Courtney was sentenced to three years in prison and one year of mandatory supervised release for having violated an earlier term of parole by failing to register as a sex offender. Courtney was scheduled to be released on October 4, 2013, at which point his term of mandatory supervised release was to have begun.

One condition for Courtney's release was that he identify a host site, approved by the Illinois Department of Corrections, where he would reside during his term of release. See 20 Ill. Admin. Code § 1610.110(a) (an order for release on parole is not effective and the inmate shall not be released until arrangements have been made for a "proper and approved residence," and the prison warden may hold the inmate until arrangements are approved).

The Illinois Department of Corrections Administrative Directive 04.50.110 provides "written instructions to staff regarding [their] responsibilities" in the host site approval process. IDOC Administrative Directive 04.50.110 § II.A (effective Nov. 1, 2007). Approximately twelve months before an offender's projected mandatory supervised release date, a representative from the department's Field Service office "shall" obtain from the inmate his release plan—i.e., where he plans

to live upon release. § II.F.1(a). If the inmate does not have a release plan, the Field Service representative "shall" help him develop one. *Id.* The Field Service representative "shall" ensure that the release plan is entered into the Offender Tracking System and a release packet is prepared. § II.F.1(b) & (c). And the prison warden "shall ensure" that the Field Service representative completes these steps. § II.F.1.

The process for approving an inmate's release plan varies slightly depending upon the inmate's parole category. For so-called "S" Type or Special Parole offenders like Courtney, the Field Service representative submits the release packet to the appropriate parole supervisor, who assigns the case to a parole agent. IDOC Administrative Directive 04.50.110 § II.H.3(a)(2). The parole agent is responsible for meeting prospective hosts and conducting site investigations of the inmate's proposed residence. § II.H.3(c)(2). Either the parole agent or her supervisor enters the results of the investigation, approving or rejecting the proposed residence, into the Offender Tracking System. § II.H.3(c)(3) & (c)(4). The Field Service representative receives daily notifications regarding host site denials via the Offender Tracking System. § II.H.3(a)(3). If a proposed host site is denied, the Field Service representative "shall" develop alternative release plans. *Id.* Meanwhile, the parole agent "shall … [c]ontinue to develop, investigate, and process alternative community host plans." § II.H.3(c)(5). If no alternative plan is developed, both the Field Service representative and the parole agent "shall" contact the Placement Resource Unit for assistance. § II.H.3(a)(3) & (c)(5).

On August 29, 2012, more than a year before his scheduled release, Courtney submitted two potential host sites to the Field Service office for investigation. The first was the home

of a friend on Rhodes Street in Centralia, Illinois. The second was a halfway house in East St. Louis that accepts sex offenders. In March or April 2013, Courtney sent a letter to the Field Service office with another potential host site, a property owned by the same friend, this one on Maple Street in Centralia. At some unknown time during his incarceration, Courtney sent another letter, this time saying that his release plan was to live with the same friend at a house on Locust Street, or, in the alternative, at the halfway house in East St. Louis. Of all the host sites proposed by Courtney, only the Rhodes Street address was submitted by the Field Service office for investigation, and it was rejected by the parole office in August 2013. No one at the Department of Corrections ever submitted Courtney for placement at the halfway house or referred him to the Placement Resource Unit for assistance.

On October 4, 2013—the day Courtney was scheduled to be released—a correctional officer came to his cell and told him he had been "violated" and would not be leaving the prison that day. The Department of Corrections determined that Courtney had not identified a suitable host site, so a warrant—signed by defendant Godinez—was issued for his arrest. Courtney's parole violation report, dated October 6, 2013, recommended that he remain at the Menard prison until appropriate housing was found. The report also directed that Courtney be "referred to the Placement Resource Unit so adequate housing may be located in as expeditious a manner as possible."

More than a month later, at a revocation hearing on November 14, 2013, the Prisoner Review Board issued an order formally revoking Courtney's mandatory supervised release. The Board's order said that Courtney would be released

"upon the approval of a viable host site as determined by IDOC." No suitable host site was ever approved, however, so Courtney completed his entire one-year term of mandatory supervised release in prison.

Starting on October 4, 2013 and continuing through the following months, Courtney filed numerous grievances with prison officials insisting that he had submitted suitable host sites to the Field Service office and that his continued imprisonment was unlawful. Several of his grievances went unanswered. One was denied on the false premise that the Field Service office had submitted Courtney for placement at the halfway house. On October 18, 2013, Courtney filed a grievance complaining that he was being kept in prison illegally and that no one had investigated the host sites he had proposed. In a report denying Courtney's grievance, the grievance officer asserted that the Field Service office had submitted Courtney for possible placement at the halfway house on November 8, 2013. As a designated witness for the Department of Corrections confirmed in her later deposition, that assertion was simply false. Courtney unsuccessfully appealed his grievance to defendant Harrington and then to defendant Godinez.

In the meantime, other Menard inmates whose release dates were after Courtney's and who were not sex offenders (and who therefore had fewer restrictions on where they could live) were released to that same halfway house while Courtney remained at Menard. After completing his one-year term of mandatory supervised release in prison, Courtney was released on October 3, 2014.

B. *District Court Proceedings*

After his release, Courtney sued several Department of Corrections officials for damages under 42 U.S.C. § 1983. In his operative complaint, Courtney alleges that defendants wrongfully prolonged his detention in violation of the Eighth and Fourteenth Amendments. Specifically, he claims that defendants ignored his communications regarding potential host sites and took insufficient action to ensure he was released on his scheduled date. Courtney also alleges that defendants' refusal to release him on his scheduled release date because they anticipated he would violate conditions of his supervised release—despite the fact that no such violation had yet occurred—was unconstitutional. Courtney's complaint also accuses defendants of depriving him of his liberty without due process in two main ways. First, he accuses defendants of failing to carry out their duties when they ignored multiple communications and grievances he sent regarding potential host sites. Second, he asserts that his mandatory supervised release was revoked without adequate procedural protections, including notice and the opportunity to be heard.

In their answer, defendants asserted several affirmative defenses, including qualified immunity, absolute immunity, sovereign immunity, and statute of limitations. Three months later, defendants sought leave to amend their answer to assert as an additional affirmative defense that Courtney's claims were barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). Under *Heck*, a plaintiff alleging that his state conviction or sentence was unconstitutional may sue for damages under § 1983 only if his conviction or sentence has been reversed, expunged, invalidated, or called into question by a federal court's writ of habeas corpus. *Id.* at 486–87. If the plaintiff's conviction or

sentence has not been set aside, then the district court must dismiss his complaint if finding in his favor would "necessarily imply the invalidity of his conviction or sentence." *Id.* at 487.

Courtney opposed the defendants' motion to amend, arguing that *Heck* did not apply. His theory was and is that his claim for wrongful detention past his scheduled release date seeks to vindicate his underlying sentence, not attack it. The magistrate judge assigned to the case agreed and denied defendants' motion to amend as futile. The defendants filed a motion for reconsideration and on the same day moved for summary judgment.

The case was then transferred to the assigned district judge, who concluded that defendants should have been permitted to amend their answer and that *Heck* barred all of Courtney's claims. The court first rejected Courtney's argument that he was not challenging his underlying sentence, noting that supervised release was part of Courtney's sentence. The district court then considered whether judgment in Courtney's favor would necessarily imply the invalidity of his sentence. It would, the court reasoned, because finding that Courtney was wrongfully detained would mean the decision to revoke his mandatory supervised release was invalid. Concluding that *Heck* applied, the court dismissed Courtney's claims without prejudice.[1]

---

[1] In *Heck*, the Supreme Court wrote that where the doctrine applies, the burden is on the plaintiff to prove the conviction or sentence has been reversed or set aside. 512 U.S. at 486–87 ("plaintiff must prove…."). The procedural status of *Heck* has divided the circuits. Is the favorable-termination requirement jurisdictional, is it an affirmative defense that must be pled in an answer on pain of waiver, and may a case dismissed without

II. *Analysis*

In *Heck*, the Supreme Court held that a plaintiff alleging that his conviction or sentence was unconstitutional does not state a claim under § 1983 unless the conviction or sentence has been set aside. 512 U.S. at 487. *Heck*'s favorable-termination requirement is "rooted in pragmatic concerns with avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments." *McDonough v. Smith*, 139 S. Ct. 2149, 2157 (2019). Consequently, if a judgment in plaintiff's favor would not imply the invalidity of his conviction or sentence, then *Heck* does not apply: the plaintiff's claim is cognizable under § 1983 even if his conviction or sentence has not been invalidated. *Heck*, 512 U.S. at 487.

"*Heck* uses the word 'sentence' to refer … to substantive determinations as to the length of confinement." *Wilkinson v. Dotson*, 544 U.S. 74, 83 (2005). *Heck*'s favorable-termination requirement thus extends to claims that a plaintiff's good-time credit, parole, or supervised release was improperly revoked. Such claims would, if successful, necessarily challenge the duration of a plaintiff's confinement. *Edwards v. Balisok*, 520 U.S.

---

prejudice on *Heck* grounds count as a "strike" under the Prison Litigation Reform Act? See *Garrett v. Murphy*, 17 F.4th 419, 425–28 (3d Cir. 2021) (surveying circuits and holding *Heck* requirement is non-jurisdictional element of claim and that dismissal on *Heck* grounds may count as a strike for failure to state a claim). The Seventh Circuit has been in the non-jurisdictional affirmative-defense camp, with the strike question addressed in non-precedential orders. See *Polzin v. Gage*, 636 F.3d 834, 837–38 (7th Cir. 2011) (not jurisdictional); *Carr v. O'Leary*, 167 F.3d 1124, 1126 (7th Cir. 1999) (affirmative defense). In light of the circuit split, district courts may find it prudent as a matter of case management to determine earlier rather than later whether a defendant will raise the issue.

641, 646 (1997) (loss of prison good-time credits); *Knowlin*, 207 F.3d at 909 (parole revocation); *Antonelli v. Foster*, 104 F.3d 899, 901 (7th Cir. 1997) (*Heck* applies to suits "premised … on the invalidity of confinement pursuant to some legal process" including parole revocation).

Courtney's claims do not challenge his original conviction or sentence. Defendants contend instead that *Heck* bars his claims because a judgment in his favor would necessarily imply that the Prisoner Review Board's November 14, 2013 order revoking his mandatory supervised release was invalid, and that order has not been set aside. To determine whether *Heck* bars Courtney's claims, we evaluate each in turn.

A.  *Whether Release Was Revoked Without Due Process of Law*

Courtney alleges that the process leading to revocation of his supervised release was procedurally deficient, depriving him of his liberty without due process of law. Specifically, Courtney claims he was not given notice or the opportunity to be heard before he was denied release and that he was not given notice or a chance to be heard at the Prisoner Review Board hearing. He also complains that he was denied the opportunity to procure witnesses or to obtain counsel before the Board's hearing and that the Board's hearing was not held "within a constitutionally permissible time" after his release was denied.

This claim is barred by *Heck*. The alleged procedural defects would, if proven, imply that the Board's revocation of Courtney's supervised release was improper. See *Edwards*, 520 U.S. at 646 (applying *Heck* to bar plaintiff's claim that prison disciplinary hearing in which plaintiff's good-time credits were revoked was procedurally deficient). Before

Courtney can bring such a claim, he must show that the order revoking his supervised release has been set aside in some fashion, and that has not happened.

B. *Whether Release Was Revoked Without Evidence of a Violation*

Next, we address Courtney's claim that defendants anticipatorily revoked his mandatory supervised release without evidence that he had actually violated any of its terms, in violation of his Eighth and Fourteenth Amendment rights. Courtney claims that because he was "violated at the door," he never lived at a host site that violated his supervised release conditions, so the revocation of his supervised release was unconstitutional.

This claim is also barred by *Heck*. A judgment in Courtney's favor would necessarily imply that the revocation of his supervised release was unjustified and invalid. See *Wilkinson*, 544 U.S. at 81–82 (*Heck* bars § 1983 claims "absent prior invalidation" if success "would necessarily demonstrate the invalidity of confinement or its duration.").

C. *Whether Defendants Intentionally or Recklessly Failed to Effect Courtney's Release*

Last, we address Courtney's primary claim, taking at face value his factual allegations: that at least some defendants deliberately or recklessly failed to effect his release on or after October 4, 2013. Courtney alleges that, prior to his scheduled release date, defendants failed to investigate three of the host sites he identified, including the halfway house in East St. Louis. Then, after he was deemed in violation of his conditions on October 4, 2013, Courtney alleges, defendants ignored his communications and grievances complaining that

he was being wrongfully detained and imploring defendants to release him to the host sites he had previously identified. Courtney alleges that defendants' actions resulted in longer imprisonment in violation of the Eighth and Fourteenth Amendments.

The inquiry under *Heck* is whether Courtney's claims would necessarily invalidate the Board's order. We analyze separately his allegations regarding defendants' conduct before and after the Board revoked his supervised release.

### 1. *Defendants' Conduct After November 14, 2013*

Courtney's claims regarding defendants' behavior after November 14, 2013 are not barred by *Heck*. The Board revoked Courtney's supervised release after it determined that he had not identified an approved host site. Courtney's claims that defendants, *after* November 14, 2013, deliberately or recklessly ignored his grievances and communications regarding possible host sites, if substantiated, would not necessarily imply that the Board's decision to revoke his supervised release *on* November 14, 2013 was invalid.

In *Gilbert v. Cook*, 512 F.3d 899, 901 (7th Cir. 2008), we held that *Heck* did not bar a prisoner from suing for alleged violations of his constitutional rights that occurred *after* events that were the subject of prison discipline. In *Gilbert*, a prison disciplinary board determined that a prisoner had thrown a punch in a fight with guards, and the board revoked a year of his good-time credit. *Id.* at 900. While *Heck* barred claims that would challenge the board's finding, it did not bar the prisoner's claim that guards dislocated his shoulder in retaliation after his own punch. *Id.* at 901. We explained that *Heck* and

*Edwards* "do not affect litigation about what happens after the [adjudicated offense] is completed." *Id.*

The same reasoning applies here, and with even more force because Courtney did not act or fail to act—in any way he could control—to violate the terms of his scheduled release. Courtney alleges that after the Board entered its order revoking his supervised release, defendants deprived him of liberty by deliberately or recklessly failing to carry out their duties to respond to his grievances, to investigate his proposed host sites, and, if necessary, to assist him in finding a suitable site. He may bring that claim without undermining the Board's November 14, 2013 finding that he lacked an approved host site as of that time. In fact, far from attacking the Board's order, Courtney seeks to vindicate it. The order instructed that Courtney should be released "upon the approval of a viable host site as determined by IDOC." *Heck* does not bar these claims.

### 2. *Defendants' Conduct Before November 14, 2013*

We also find that *Heck* does not bar Courtney's claims that defendants deliberately or recklessly failed to investigate potential host sites or to respond to his grievances before November 14, 2013. As noted above, the Board found that Courtney did not have an approved residence, as is required for mandatory supervised release. See 20 Ill. Admin. Code § 1610.110(a)(1) (providing that a "proper and approved residence" is a condition for release on parole). Courtney does not challenge the Board's finding. He agrees that the Department of Corrections never approved a host site for him. His claim is that defendants prolonged his imprisonment by deliberately or recklessly failing to act. Three host sites he submitted were never investigated, nor did the department find or even

propose any alternatives. As a result, no host site was approved, and he remained in prison for another year.

Defendants cite several cases, all non-precedential or otherwise non-binding, in which *Heck* barred claims by plaintiffs alleging that their parole was wrongly revoked. In those cases, parole was revoked because the relevant decision-making body determined that the parolee acted or failed to act in some manner that violated conditions of his parole.[2]

This case is different. Though the Board's order was styled as a "violation," the order did not revoke Courtney's supervised release because he engaged in any act of his own volition that violated terms of his mandatory supervised release. As Courtney himself stresses, he never lived at a location that violated the conditions of his release. Rather, his mandatory supervised release was revoked because an item on his release checklist was unchecked: he had no approved host site.

That Courtney's "violation" is poorly named is evident from the order itself. It distinguishes between violating the terms of supervised release and lacking an approved host site. The order is a standard form giving the Board four options. The Board may find (1) that the offender is not a violator, (2) that the offender is a violator, (3) that the offender is to be released "upon the approval of a viable host site as determined by IDOC," or (4) that the hearing is continued. If the offender is found to be a "violator," then the Board must

---

[2] E.g., *Hadley v. Quinn*, 524 F. App'x 290, 291 (7th Cir. 2013) (parole revoked after plaintiff left state without permission, in violation of parole conditions); *Easterling v. Siarnicki*, 435 F. App'x 524, 525 (7th Cir. 2011) (supervised release revoked after plaintiff refused to comply with requirement that he wear an ankle monitor and reside in transitional housing).

select from several rationales: that he committed a criminal offense, violated a condition of his release agreement or special order, absconded, or failed to report. The only box checked on the order revoking Courtney's supervised release is the one indicating that his release would be effective upon the Department of Corrections' approval of a host site.

Because his release was contingent on the Department of Corrections approving a host site, the Board's order was, at bottom, based not on a finding that Courtney had done anything wrong but on a finding that defendants in the Department had not done something: approved a host site for Courtney. The Board did not find that the host sites Courtney submitted were not suitable. That would be a different case. Here, the Board simply found that no host site had been approved, a task that, as the Department's Administrative Directive 04.50.110 makes clear, Courtney was utterly incapable of achieving by himself. He needed defendants to act, and he alleges they deliberately or recklessly failed to do so.

We acknowledge, of course, that the failure of officials to comply with departmental regulations or even state law does not necessarily violate the Constitution. E.g., *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006); see also *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) ("Section 1983 protects against 'constitutional violations, not violations of … departmental regulation and … practices ….'"), quoting *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003). By discussing defendants' alleged failures to comply with Administrative Directive 04.50.110, we do not mean to imply that violations of the Directive are sufficient to establish a constitutional violation. They are not.

Rather, the Directive is relevant to Courtney's claims insofar as it identifies the respective responsibilities of the inmate and the Department of Corrections to identify, investigate, and approve host sites. And while violations of state law or policy do not per se violate the Constitution, when those violations result in unjustified deprivations of liberty, the Constitution is implicated. For example, in *Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1998), the plaintiff had been held in jail without a hearing for 57 days without appearing before a judge, contrary to state law and standard operating procedures. We reversed summary judgment for defendants and denied qualified immunity. We noted: "While the Constitution does not mandate the specific procedures accorded by Indiana, neither does it tolerate the absence, following arrest, of any procedure whatsoever." *Id.* at 575–76. In addition, in a case like this where many officials may have played a role in causing or failing to remedy Courtney's prolonged imprisonment, state law or policy may help sort out questions of individual responsibility that can be so critical under § 1983.

Another way to frame the *Heck* issue on these claims is to observe that if Courtney had sought relief while in custody, these claims would be understood best as calling for a writ of mandamus—ordering correction officials to find a suitable residence during supervised release—not a writ of habeas corpus. Courtney claims he was wrongfully imprisoned, but he traces his wrongful imprisonment to the defendants' failure to perform their duties, not to a legal infirmity in the Board's decision ordering his continued confinement. If Courtney can prove that defendants deliberately or recklessly failed to investigate host sites and to respond to his grievances, that proof would not imply that the Board acted improperly when it revoked his mandatory supervised release.

The Board based its decision upon a finding that the Department of Corrections had not approved a host site. Courtney's allegations are entirely consistent with that finding. Accordingly, Courtney's claims, if successful, would not "necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson*, 544 U.S. at 82.

Accordingly, *Heck* poses no bar to Courtney's claims that at least some defendants deliberately or recklessly acted or failed to act in ways that caused him to spend an extra year in prison rather than on mandatory supervised release. The district court's dismissal of Courtney's challenges to the Board's November 14, 2013 order revoking his mandatory supervised release is AFFIRMED, but the dismissal of his other claims is REVERSED and this case is REMANDED for further proceedings consistent with this opinion.

BRENNAN, *Circuit Judge*, concurring. I join the majority opinion, and I write separately as to why I understand *Heck v. Humphrey*, 512 U.S. 477, 486 (1994), does not bar one of Courtney's claims.

Under *Heck* doctrine, "a § 1983 suit for damages that would 'necessarily imply' the invalidity of the fact of an inmate's conviction, or 'necessarily imply' the invalidity of the length of an inmate's sentence, is not cognizable under § 1983 unless and until the inmate obtains favorable termination" through a state or federal challenge to his conviction or sentence. *Nelson v. Campbell*, 541 U.S. 637, 646 (2004) (quoting *Heck*, 512 U.S. at 487). As the majority's opinion points out, the *Heck* bar extends to litigation that calls into question the validity of parole revocation decisions. *Knowlin v. Thompson*, 207 F.3d 907, 909 (7th Cir. 2000).

The Illinois Prisoner Review Board, which is independent of the Department of Corrections, 720 ILL. COMP. STAT. 5/3-3-1(a), revoked Courtney's Mandatory Supervised Release (MSR) because he lacked an approved host site at which to live during the term of his release. Nothing suggests the Board's revocation decision has been vacated, reversed, or otherwise impugned. So, *Heck* prohibits Courtney from bringing a § 1983 claim that would, if successful, necessarily imply that the Court's revocation decision is invalid. *Heck*, 512 U.S. at 486. I agree with my colleagues that the success of two of Courtney's claims—those alleging the revocation decision was made without due process and without evidence of a violation—would necessarily imply that his parole revocation was invalid, and thus that dismissal of those claims was proper.

The harder question concerns Courtney's claim that defendants' deliberate indifference caused him to be imprisoned for longer than he should have been. Success on this assertion implicates the duration of Courtney's incarceration, as Courtney must demonstrate that absent defendants' deliberate indifference, he would have been released sooner. That brings his third claim very close to the *Heck* bar. *Nelson*, 541 U.S. at 646–47. If Courtney prevails, it suggests a certain unfairness to his parole revocation. And this court has previously applied the *Heck* bar where a successful § 1983 claim "would cast a shadow over the conviction." *Hill v. Murphy*, 785 F.3d 242, 248 (7th Cir. 2015).

Still, I agree with my colleagues that Courtney's third claim should proceed, but for slightly different reasons. As noted, the key question under *Heck* is "whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." 512 U.S. at 487. If it would, and the imprisonment is intact, the claim must be dismissed. *Id.* Our precedent guides this inquiry. When deciding whether the *Heck* bar applies, we "must analyze the relationship between the plaintiff's § 1983 claim and the charge on which he was convicted." *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 762 (7th Cir. 2008) (quoting *VanGilder v. Baker*, 435 F.3d 689, 691 (7th Cir. 2006)). This requires careful consideration of what a successful § 1983 suit would necessarily imply, because "*Heck* forbids a prisoner in his civil rights case to challenge a finding in his criminal or prison-discipline case that was essential to the decision in that case." *Moore v. Mahone*, 652 F.3d 722, 723 (7th Cir. 2011) (citation omitted). So, for example, this court has held that a § 1983 claim alleging police used excessive force during an arrest does not necessarily

imply the invalidity of a conviction for resisting that same arrest. *Evans v. Poskon*, 603 F.3d 362, 364 (7th Cir. 2010).

Courtney's third claim survives this analysis. A judgment in his favor means he should have been released sooner, but it does not necessarily imply the invalidity of his revocation. Comparing a putative judgment in Courtney's favor with the Board's revocation decision shows this. The Board revoked Courtney's MSR because he lacked an approved host site. But a win for Courtney on his § 1983 claim does not necessarily imply the invalidity of his revocation. If Courtney prevails, it means the defendants' deliberate indifference prevented him from obtaining an approved host site and leaving prison on his MSR date. Yet it also confirms the ground for the Board's revocation—that Courtney lacked an approved site. In other words, a judgment for Courtney on his § 1983 claim means the Board's revocation was proper, but that defendants' unconstitutional conduct still caused him to stay in prison longer than he otherwise might have. Courtney's third claim thus falls short of necessarily implying the invalidity of his parole revocation.

*Heck* often plainly bars § 1983 claims bearing on a prison board's parole revocation decision. *See, e.g., Knowlin*, 207 F.3d at 909; *Barker v. Reagle*, No. 22-2572, 2023 WL 2931290, at *1–2 (7th Cir. April 13, 2023); *Easterling v. Siarnicki*, 435 Fed. App'x 524, 526 (7th Cir. 2011). But in this specific circumstance, I agree the *Heck* bar does not apply to Courtney's third claim that defendants intentionally or recklessly failed to effect his release.